UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JOHN KOEHLER,

        Plaintiff,

v.                                                           Case No. 12-C-372

SARA LEE CORP.,

        Defendant.

## DECISION AND ORDER

Plaintiff John Koehler brought this action alleging retaliation in violation of Title VII, 42 U.S.C. § 2000e-3(a), after he was terminated from his position as the human resources director at Defendant Sara Lee's New London plant. Sara Lee has moved for summary judgment. For the reasons given below, the motion will be granted.

**I. Background**

At all times relevant to this lawsuit, Koehler was employed as human resources director at Sara Lee's New London plant, which processes smoked and cured meat products. Koehler's performance reviews were generally considered good, and as recently as 2009 he received a ten-percent bonus. In January 2010, however, while he was out on leave, Sara Lee learned that Koehler's subordinates at times viewed him as being unprofessional and abusive, that he restricted the information that his subordinates were able to provide to Sara Lee's corporate headquarters, that he had instructed his subordinates not to communicate information with the New London plant manager, and that Koehler openly made disparaging remarks about his subordinates and supervisor. In fact, both Assistant Human Resources Managers who reported to Koehler stated that they were

experiencing emotional distress and had sought counseling because of their interactions with Koehler and the tense work environment he created. On February 2, 2010, Koehler was informed his employment was terminated because his leadership style was inconsistent with Sara Lee's desired leadership competencies and capabilities. (ECF No. 17, ¶¶ 71-73, 87, 89.)

Koehler claims that Sara Lee's stated reason for terminating his employment was pretextual and that the real reason was retaliation for his opposition to company practices that were unlawful under Title VII. In fact, Koehler contends that the only reason Sara Lee terminated his employment was because he opposed Sara Lee's unequal treatment of its employees. In support of his allegation, he points to evidence that he continually raised questions as to whether Sara Lee's female and minority employees were being properly paid.

Sara Lee denies Koehler's allegation that he was terminated because of his opposition to its employment practices and counters that Koehler never even complained about its employment practices. This is not to say that he never raised questions about employment and pay for minorities and women. As the human resources director of the plant, Koehler had some responsibility for compliance with Title VII and the company's affirmative action plan. (ECF No. 17, ¶ 18.) It was his job to address such matters. But Sara Lee denies that Koehler ever complained of unlawful practices. Although Koehler did file internal complaints, Sara Lee argues that his complaints were "an attempt to deflect attention away from his own behavior and insulate himself from discipline." (ECF No. 16, at 1.)

## A. Plaintiff's First GBP Complaint

In 2008, Lynn Green, a contract nurse who provided services at the plant, complained that Koehler verbally abused her. (ECF No. 17, ¶ 27.) After he learned that Green had made a

2

complaint, Koehler filed his first Global Business Practices (GBP) complaint. A GBP complaint was the vehicle employees were instructed to use to bring to management's attention conduct by other employees that they believed violated Sara Lee's Global Business Standards or the law and which employees could not address with their manager. (ECF No. 17, ¶¶ 14, 31.)

In his complaint, Koehler indicates that he previously had been attempting to alert management about a conflict of interest between Green and the plant's safety officer. (Koehler noted that the two were friendly outside of work.) (ECF No. 23-2 at 3. ¶ 31.) He further stated that he now believed that he was being retaliated against for raising the conflict of interest issue. For example, he received a letter from a company vice-president telling him to "stand down" in an unrelated labor relations issue. This, Koehler claimed, was a threat out of left field and must therefore be related to his conflict of interest complaint. He did not explain why the company vice-president would have any reason to retaliate against him for a complaint about a nurse.

In addition, Koehler saw retaliation when a planned meeting between himself and Sue Dirksen, the director of health services, was cancelled because Dirksen had talked to Nurse Green and no longer wanted to meet with Koehler "because of your behavior." (*Id.* at 5.) Koehler wrote that this charge was "challenging his integrity" and that he "could only assume that these unusual events, which happened after the complaint was filed, are in retaliation for making a good faith obligatory GBP report." (*Id.*) Koehler further stated that he was seeking professional counseling as a result of the retaliation. Again, he did not explain why a director of health services would have any incentive to retaliate against him. Even so, he stated that if any further retaliation occurred, he would assume it was a response to the filing of his report and / or his age and / or his status as a disabled Vietnam veteran. (*Id.*)

A subsequent investigation by Koehler's then-supervisor, Ronald Jones, concluded that there was merit to Nurse Green's complaint and that Koehler had displayed belittling and demeaning behavior towards Green. (ECF No. 17-11, ¶ 8.) Jones further concluded that Koehler's subsequent complaint was part of an effort to discredit Green. Jones' report concludes by noting that Koehler himself agreed that his retaliation complaint was not a proper response to the allegations made by Green. (ECF No. 17-11 at 5.)

**B. Plaintiff's Inquiries Regarding Pay Equality**

During his tenure as the head of HR at the New London plant, Koehler had occasionally expressed concern about the company's affirmative action plans and questioned whether certain minority or disabled employees were being paid at levels comparable to other employees. In late 2009, Koehler sent a number of emails questioning whether four production supervisors were being paid fairly. He noted that his inquiries dated back to 2008, when he was reviewing salaries and it appeared to him that the supervisors he identified were being underpaid. (ECF No. 17-2 at Ex. 18.) At that time management had looked at the numbers and concluded that everything was fine. Even so, a year later Koehler believed that the underlying data could have been "bogus" and wanted again to make sure that everything was legal. (*Id.*) Koehler's emails state that he was not making any specific wage recommendations but merely wanted the appropriate people to look into matters to ensure that there was no discrimination.

**C. Plaintiff's Second GBP Complaint**

Around the same time, on December 14, 2009, the director of employee relations, Peter Kyrychenko, sent an email to Koehler expressing frustration:

> I feel as if you keep asking the same questions over and over without demonstrating that you truly understand what we previously discussed. . . In addition, as I try to gain clarity around local practices, you seem to be distant from what actually happens day to day and are having difficulty answering basic questions without assistance from your team.

(ECF No. 17, ¶ 57.)

A day later, Koehler filed a second GBP complaint with the company. His report summary indicated that the subject of the complaint was "Failure to comply with company and federal AAP [Affirmative Action Plan] Guidelines. Inability to get responses to my inquiries on compliance issues." (ECF No. 23-2, Ex. 17.) His complaint set forth five separate inquiries that he wanted resolution on. All of these issues involved his inquiries about equal pay for female, minority and disabled employees, as well as compliance with the company's affirmative action programs. He closed his complaint by noting that he would regard any further "random written or verbal comment" by Kyrychenko as an attack on his character and professional reputation. (*Id.*) He further reiterated that if he experienced any retaliation as a result of his complaint, he would assume "it is due to filing this report, my Disabled Vietnam Veteran status and/or my age and I will take appropriate action." (*Id.*)

**D. Plaintiff's Leave of Absence**

About three weeks later, on January 5, 2010, Koehler requested and was granted a leave of absence. While on leave, he sent an email to Phillip Ramsey indicating his belief that the company might be violating one or more federal laws by not compensating employees fairly. He further indicated that his mental condition was deteriorating in light of all the stress "over this matter," which he described as the most stressful event he had dealt with in forty years and reminded him of his service in Vietnam. (ECF No. 23-2, Ex. 25.) He further stated that he knew his job was on

5

the line. He explained in his deposition that he knew his job was on the line because during his leave he refused to conduct some sixteen HR meetings with New London plant employees, which would be "looked at as insubordination" by the company. (ECF No. 17-4 at 133-34.) He further explained that his frustration stemmed from the fact that although he didn't know for sure if the company was violating federal employment laws, his questions were not being answered to his satisfaction. (*Id.* at 135.)

While Koehler was on leave, the company took the opportunity to investigate his own job performance. Dave Degan, a vice-president, and Suzanne Gargis, Koehler's supervisor, learned from other employees that Koehler often made disparaging remarks about subordinates and had been unprofessional and abusive. Both of his assistant HR managers reported that they were under so much stress that they had sought counseling as a result of working for Koehler. One of them explained that "I decided to go [to counseling] when I became so frustrated I was willing to quit the job I have loved for more than 9 years." (ECF No. 17-8 at 44.) This employee felt it necessary to invent a personal reason to use the company's counseling services because there would be repercussions and retaliation if Koehler knew "he was the reason I was using the service." (ECF No. 17-8 at 44.) Another of Koehler's assistant managers also feared retaliation and was looking for other employment. (ECF No. 17-8 at 49; ECF No. 17 at ¶¶ 71-81.) This employee had also used the company's counseling services and apparently paid for counseling on her own due to the "emotional stress" of the work environment under Koehler. (ECF No. 17-8 at 49.)

On January 26, 2010, Koehler drove to the Downers Grove, Illinois headquarters and participated in a short meeting with company higher-ups, who continued to assure him that there was no discrimination going on in his plant. In his deposition Koehler testified that he believed the

6

meeting was a cursory formality to address his complaints and that nothing much of substance was actually discussed because one of the participants could only be there for a short time due to another scheduled meeting. (ECF No. 17-4 at 137-44.)

**E. Termination**

A week later, Suzanne Gargis and Phil Ramsey, the plant manager, met Koehler at a restaurant and informed him that his employment was being terminated. Gargis, Koehler's supervisor, told him merely that his leadership style was not in accordance with company practices. (ECF No. 17-3 at 25.) Koehler soon filed a complaint with the state Equal Rights Division, and in 2012 this lawsuit followed.

**II. Analysis**

Summary judgment is proper only if the facts, when viewed in the light most favorable to the non-moving party, show that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. *Good v. Univ. of Chicago Med. Ctr.,* 673 F.3d 670, 673 (7th Cir. 2012).

Under Title VII, it is unlawful for an employer to discriminate or retaliate against an employee because the employee opposed any practice made unlawful by Title VII. 42 U.S.C. §2000e-3(a). Koehler argues that his emails and verbal questions about affirmative action plans and fair pay for employees was protected activity and that the company fired him as a result of that activity. Plaintiffs in such circumstances may proceed under either a direct method of proof or an indirect method. Koehler attempts to proceed under both methods. As discussed further below, in this case the two methods involve essentially the same analysis.

7

**A. Direct Method**

Under the direct method of proof, a plaintiff must offer evidence: (1) that he engaged in protected activity, (2) that he was subjected to an adverse employment action, and (3) that there was a causal link between the protected activity and the employment action. *Brown v. Advocate South Suburban Hosp.,* 700 F.3d 1101, 1106 (7th Cir. 2012).

**1. Opposition to Practices Made Unlawful by Title VII**

The first question is whether Koehler's emails, complaints and other inquiries constitute protected activity, that is, whether they were in opposition to the kind of activity that Title VII makes unlawful. *O'Leary v. Accretive Health, Inc.,* 657 F.3d 625, 631 (7th Cir. 2011) ("Regardless of which method the plaintiff employs to show retaliation, he must first demonstrate that he engaged in activity that is protected by the statute."). "Specifically, he must show that he took some step in opposition to a form of discrimination that the statute prohibits." *Id.* The plaintiff does not have to show that the defendant actually discriminated in violation of Title VII; "he may be mistaken in that regard and still claim the protection of the statute." *Id.* (*Pickett v. Sheridan Health Care Ctr.*, 610 F.3d 434, 441 (7th Cir. 2010) and *Fine v. Ryan Int'l Airlines*, 305 F.3d 746, 752 (7th Cir. 2002)). But he must oppose the conduct and his opposition must be based on a good-faith and reasonable belief that he is opposing unlawful conduct. *Leitgen v. Franciscan Skemp Healthcare, Inc.,* 630 F.3d 668, 674 (7th Cir. 2011). When the employee's activities are not disputed, the question of whether they constitute protected activity is a question of law. *Barnes v. Small,* 840 F.2d 972, 976 (D.C. Cir. 1988).

Koehler appears to concede that his complaint about Nurse Green was not related to any concerns that would fall under the umbra of Title VII. Indeed, it actually supports Sara Lee's

8

argument that Koehler uses complaints to respond to complaints about his own behavior and immunize himself from discipline. Instead, he focuses his argument on the numerous questions he raised about potentially unequal pay for minority and female supervisors as well as the company's affirmative action plans.

Sara Lee argues that none of Koehler's statements were concrete accusations, and neither were they made in opposition to any specific employment practices. Specifically, Sara Lee notes that Koehler always couched his communications as questions about *whether* certain employees were being paid fairly. That is, he never actually asserted that illegal activity was going on, nor did he specifically recommend that the individuals he asked about be given raises. For example, in his October 2009 email he notes some "potential issues" and says "I think we may want to take another look at this as we have added some new people within the last 12 months that may have some compression implications within the shift supervisor classification." (ECF No. 23-2 at 12.) Similarly, in his December 2009 email to Suzanne Gargis, he states that "I am not making any wage recommendation here" and says that "I am raising the question. . . . . are these folks being paid correctly compared to their peer group?" (ECF No. 23-2 at 11.) Sara Lee argues that these kinds of emails were merely questions rather than any kind of opposition to unlawful conduct.

Koehler argues that the Defendant is reading his concerns too narrowly. Although it is true that he was merely raising questions rather than making accusations, he contends the obvious takeaway from his numerous complaints is that he believed the company was discriminating against certain of its employees. The fact that he did not come forward with a specific charge is not dispositive of the issue. For example, in *Leitgen,* the plaintiff "repeatedly pointed to evidence that she has always framed her complaints as a potential issue of gender discrimination. Moreover, the

9

ongoing nature of her complaints during her tenure, and her tolerance of the system while she was chair, do not conclusively show that her complaints about the pay system were unreasonable or insincere." 630 F.3d at 674. In that case, the plaintiff was making allegations and suggestions about *possible* gender discrimination without knowing for certain whether those allegations were true. That is, in fact, a commonplace occurrence, because seldom will an employee have ironclad proof that discrimination is occurring. All that is required to constitute protected activity is that the employee has a reasonable belief that the complained-of conduct could be illegal. *Fine v. Ryan Int'l Airlines,* 305 F.3d 746, 752 (7th Cir. 2002) ("We have repeatedly held that a plaintiff need not prevail on her Title VII discrimination claim or have opposed an action that in fact violated Title VII to win a retaliation claim. All that is required is that 'she reasonably believed in good faith that the practice she opposed violated Title VII.'")

Here, the lengthy pattern of questioning as well as Koehler's citation of data and spreadsheets, are sufficient to trigger the protection that he believed discrimination was occurring, at least at this stage of the proceeding. It is true that he couched his concerns in questions rather than pure accusations, but the nature of the emails and complaints could lead a jury to conclude that he genuinely believed something was awry with employee compensation. Of course, a jury could also conclude, as Sara Lee contends, that Koehler's "questions" were not raised in good faith but were simply an effort on his part to immunize himself from any consequences of his own performance deficiencies. His repeated warning that he would regard adverse action toward, or even comment about, him as retaliation does provide some support for Sara Lee's contention, especially given Koehler's training and experience as the human relations director. But whether he was protesting what he in good faith believed to be unlawful conduct under Title VII, at least on the

10

record as it now stands, seems to be an issue for a jury to decide. The court therefore turns to Sara Lee's second argument.

**2. Causation**

There is no doubt that being terminated constitutes an adverse employment action (the second prong of the analysis), and so the remaining question is whether Koehler has evidence that the termination was caused by his protected activity. It is rare that employers actually admit to an improper motivation, so a typical plaintiff must show that his protected activity was the cause of his termination by creating a "convincing mosaic of circumstantial evidence" that would support the inference that a retaliatory animus was at work. *Troupe v. May Dep't Stores Co.,* 20 F.3d 734, 737 (7th Cir. 1994). This may be shown by such things as suspicious timing, treatment of similar employees, or evidence that the reason given by the employer is simply pretextual or fabricated. *Coleman v. Donahoe,* 667 F.3d 835, 860 (7th Cir. 2012). As the concurrence in *Coleman* noted, the questions involved in cases like this involve similar inquiries regardless of whether the direct or indirect method is used. *Id.* at 862-63 (Wood, J., concurring).

Recently, the Supreme Court held that retaliation claims under Title VII require traditional but-for causation, not a lesser "motivating factor" standard of causation. *University of Texas Southwestern Medical Center v. Nassar,* 133 S.Ct. 2517, 2534 (2013). The Court held that "[c]ausation in fact— i.e., proof that the defendant's conduct did in fact cause the plaintiff's injury—is a standard requirement of any tort claim ...," *id.* at 2524, and this standard "requires the plaintiff to show that the harm would not have occurred in the absence of—that is, but for—the defendant's conduct," *id.* at 2525 (internal quotation marks omitted).

11

Here, the employer states that it had solid non-retaliatory reasons for terminating Koehler because he was not meeting its legitimate business expectations. Specifically, the review it undertook prior to his termination revealed his troubling treatment of co-workers and an abrasive management style, and it argues that these issues sufficed on their own to justify his termination without respect to any protected activity.

Although the Defendant has cited a number of commonplace faults in Koehler's performance—occasionally telling employees to "shut up," for example—most jarring is the fact that both of Koehler's direct reports had sought counseling due to his treatment of them. The fact that not one but *two* of his employees needed counseling and were considering leaving the company, essentially because of Koehler, easily suffices to justify Koehler's termination. A company cannot be expected to retain a manager who adversely impacts the mental health and morale of his employees and at the same time taxes the company's own counseling resources. Such a company risks losing its employees and opens itself up to legal exposure if the affected employees face a hostile work environment.

Koehler has stipulated to the fact that "Both Assistant Human Resources Mangers who reported to Koehler stated that they believed they were experiencing emotional distress, and sought counseling, because of their interactions with Koehler and the tense work environment Koehler created." (ECF No. 21, ¶ 73.) He responds to this point simply by noting that there were positive aspects of his employment as well. For example, on various occasions Koehler's fellow employees deemed him "fair," "competent" and "someone who was dedicated to working hard for employees' rights and benefits." (*Id.*) In addition, Koehler notes that he had a strong employment history (he had recently received a bonus).

There are at least two problems with Koehler's response. First, all of the plaudits in the world (vague though they are) cannot counterbalance the fact that both assistant managers could not work for Koehler without accessing counseling services. Presumably most employees who are fired can point to a number of positive aspects of their work history (that's why they are employed as long as they are), but that does not mean the company must retain them if it uncovers evidence of a serious problem such as the one uncovered here. An employee could be the most competent and most productive employee in the world, but the employer would surely have grounds to fire him if it learned that he was embezzling money or mistreating other employees.

Second, in citing the kind of evidence Koehler cites (e.g., that he was deemed competent and fair by some employees), Koehler's argument is simply that the company got it wrong by firing him. But the courts "have stated that it is not enough for a plaintiff to show that his employer's explanation was based on an inaccurate assessment of its employee's performance." *Olsen v. Marshall & Ilsley Corp.,* 267 F.3d 597, 602 (7th Cir. 2001). The important question is not whether the employer's decision was "right" in some objective sense, the question is whether the employer's stated reason is deceitful. *Walker v. Glickman,* 241 F.3d 884, 890 (7th Cir. 2001) ("[T]he court's role is not to determine whether [the employer's] decision was right, but whether [the employee] presented sufficient evidence that [the employer's] reason was a lie for the action it took.") None of the evidence about Koehler's general good qualities speaks to the question of whether the employer was lying when it said he was fired for his poor management style. Simply put, being a competent, fair and dedicated man does not mean that the same individual is also a good manager of people. "[E]vidence that shows that an employer incorrectly assessed its employee's abilities does not shed light on whether the employer is lying about that assessment. And without proof of

13

a lie, no inference of discriminatory motive can be drawn." *Olsen,* 267 F.3d at 602. In short, Koehler's evidence fails to undermine the employer's stated reasons for terminating him.

The *Olsen* case is instructive. There, the employee, who was fired in part for being a poor manager, argued that the employer's stated reasons were pretextual but failed to contradict the evidence the employer cited in reaching the conclusion that he was a poor manager.

> He argues that Mid-State's poor-manager rationale has no factual basis but fails to sufficiently contradict salient facts that provide support for Mid-State's explanation. For example, Olsen claims that his relations with branch employees had improved by the date of his termination. He does not dispute, however, that in October 1997 several Mauston branch employees called a meeting during which they expressed to Olsen their concerns about his lack of leadership in the sales arena, encroaching management style, and poor customer relations skills. And, despite Olsen's unsubstantiated assertion to the contrary, there is evidence that at least one of the employees continued to express concerns about his managerial style until the date of his termination, ultimately suggesting to her supervisors that she would resign if Olsen continued to misuse her time and abilities. Even assuming that Olsen has presented evidence from which a jury could conclude that his employee relations had improved (and he has not), the undisputed evidence clearly provides factual support for Mid-State's assertion. *And because there is some factual basis for Mid-State's belief that Olsen was a poor manager, there is no legal basis for us to conclude that a reasonable factfinder could find its explanation a pretext for discrimination.*

*Id.* at 602-03 (italics added).

The parallels with the present case are obvious. Here, as in *Olsen,* Koehler has failed to contradict the most salient facts the employer cited in terminating him. "Olsen does not dispute the accuracy of the employees' complaints nor the fact that the decision-makers were aware of them. Therefore, a reasonable factfinder could not say that Mid-State, which was entitled to accept the employees' complaints as true and rely on them in assessing Olsen's competency, had no basis for believing that Olsen was a poor manager." *Id.* at 603. The same is true here. A jury, faced with

14

the uncontradicted facts the employer cited, would have no basis to conclude that the employer had no basis for believing Koehler was a poor manager.

Koehler also argues that the timing was suspicious because the termination closely followed his inquiries about equal pay. It is true that the timing of the *investigation* might be suspicious. Read in the light most favorable to the Koehler, the facts suggest that the pre-termination investigation could have been motivated by his complaints about equal pay and the like. In fact, the most likely explanation is that company officials were puzzled and exasperated by the fact that Koehler continued to raise the same questions despite its repeated assurances that no laws were being violated, and his questions were the sort that required the expenditure of significant corporate resources. In addition, it was clear from his complaints that Koehler would continue to view any kind of slight or mistreatment as retaliation for either his age, his veteran status, or his complaints about equality. In light of this attitude, company officials likely wanted to discover whether it was worth retaining someone who had such sharp disagreements with his superiors and who harbored the indiscriminate belief that any personal disputes he experienced with other employees would automatically constitute some sort of retaliation.

In Koehler's view, however, the company was simply looking to uncover some kind of dirt that it could use as a pretext for firing him. Even if we accept Koehler's view, however, the underlying motivation for investigating Koehler is irrelevant. Suppose a retaliatory employer conducts an investigation with the aim of trumping up grounds to terminate an employee, but then during the course of the investigation it comes to light that the employee has actually been embezzling from the company. In such a case the employer is within its rights to terminate the employee, even though the original motive for the investigation might have been improper.

15

Companies constantly undertake informal and formal investigations of their employees in the form of performance reviews, merit assessments and the like. The mere act of investigating an employee is not itself a retaliatory act or an adverse employment action. *Kuhn v. Washtenaw County,* 709 F.3d 612, 625 (6th Cir. 2013); *Joseph v. Leavitt,* 465 F.3d 87, 90 (2d Cir. 2006). Thus, even if there were some retaliatory or improper animus behind the decision to investigate Koehler, that does not mean the company is prohibited from using information gleaned in that investigation—information Koehler has stipulated to—in deciding whether to terminate him. If the company had relied on more questionable grounds for firing Koehler, then the motivation behind the investigation could conceivably speak to the question of pretext. But here, when the company uncovered substantial grounds for termination, there can be no question of pretext.

Finally, I note that even at this advanced stage Koehler has never actually brought forth evidence that the company actually *was* discriminating against other employees. If he had such evidence—or if he had made a case to the company—it would be far more plausible that the company might seek to retaliate against him to try to silence him. But when all he has done is ask questions, the notion that the employer would have any reason to retaliate is far more strained.

In sum, the significant issues uncovered during the investigation mean that Koehler is unable to show that he would not have been terminated but for his protected activity. He thus cannot establish any right to relief under the direct method.

**B. Indirect Method**

As suggested above, in a case like this where there is no direct evidence of retaliatory intent, the direct method and indirect method do not materially differ. *Coleman v. Donahoe,* 667 F.3d 835, 862-63. This is because both methods require an analysis of causation. Under the indirect method,

16

if a plaintiff establishes a *prima facie* case, the plaintiff must then show that the employer's proffered reason is pretextual, which then permits an inference that the employer's real reason was unlawful. *Johnson v. General Bd. of Pension & Health Benefits of United Methodist Church,* 733 F.3d 722, 728 (7th Cir. 2013).

Here, the employer has articulated legitimate, non-retaliatory reasons for the termination, and Koehler cannot show that they were pretextual. As noted above, it can hardly be said to be pretextual (that is, a lie) when an employer states it has fired an employee because the employee's underlings require counseling to deal with him. It might be a jury question if the underlying facts were in dispute. For example, if Koehler had placed into doubt the fact that his two assistant managers were actually in counseling because of him, a jury would need to resolve that dispute. But here, he has conceded the point and his only response is that he also had some good qualities. But, as noted above, almost every employee who is ultimately fired had various good qualities—that, after all, is why they were retained as long as they were. Citing good qualities is not enough to undermine the employer's given reasons for the termination when those reasons are as sound as they are here. Accordingly, Koehler fails under the indirect method as well.

### III. Conclusion

For the reasons given above, the Defendant's motion for summary judgment is **GRANTED** and the case is **DISMISSED**. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** this   23rd   day of December, 2013.

 s/ William C. Griesbach  
William C. Griesbach, Chief Judge  
United States District Court

17